[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-15106

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee-Cross Appellant,

*versus*

MACK DOAK,

Defendant-Appellant,

JAYCEE DOAK,

Defendant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:18-cr-00242-KD-B-1

_____

Before GRANT, LUCK, and HULL, Circuit Judges.

GRANT, Circuit Judge:

Mack Doak was convicted by a jury of transporting his three adopted daughters across state lines so that he could sexually abuse them. From the time he adopted the girls until family members finally reported him five years later he subjected them to relentless abuse.

Mack's wife Jaycee knew what he was doing. Her adopted daughters confided in her after Mack abused them, but she refused to help. She denied their allegations. She also yelled at the girls, blamed them for the abuse, and helped Mack travel across the country to keep his acts hidden. The jury convicted her of aiding and abetting.

The Doaks make an across-the-board effort to challenge their convictions, claiming that their indictment was flawed and that several evidentiary errors infected the trial. Mack also challenges the district court's restitution calculation and its finding that he could afford a special assessment. On cross-appeal, the government argues that Jaycee's sentence—the statutory minimum—was substantively unreasonable. Other than the restitution order, which we partially vacate, we affirm the Doaks' convictions and sentences.

## I.

The tragic history of the Doak family began in Rhode Island, where 27-year-old Mack Doak met 18-year-old Jaycee Thet.

Despite the age gap, the two began a romantic relationship. Mack's interests, however, extended beyond Jaycee. While at work as a city bus driver, he had his eyes set on one of his regular passengers: 14-year-old Nicole.[1] Mack eventually introduced himself to Nicole and became very attentive, lavishing her with gifts on Valentine's Day and taking her to Boston for dinner. Nicole (unaware of Mack's relationship with Jaycee) came to believe that she was Mack's girlfriend—and that she owed him physical intimacy. She began having sex with him almost every time they met, but then Jaycee and Nicole learned about each other. Mack told Jaycee that he planned to leave her for 14-year-old Nicole, but Jaycee got Nicole's father involved. Nicole ended her relationship with Mack, but she never reported Mack to the police. Around the same time, Jaycee gave birth to the couple's first daughter.

Meanwhile, Mack also used his relationship with Jaycee to get closer to her younger sister Natalie, who was in elementary school. After Natalie turned ten or eleven, Mack began groping her—constantly touching "anything that he could"—including her breasts, her buttocks, and her genitals. The abuse progressed over several years until one day, when Natalie was laying on the couch sick, he offered to rub a balm on her back. As he was applying the balm, he tried to pull down her pants. When Natalie, who was 12 or 13 years old, asked Mack what he was doing he told her to be

---

[1] The victims' names were changed at trial to protect their privacy, and we adopt those same pseudonyms.

quiet.  He pulled down her pants and raped her.  She kept silent and told no one for years.

Not long after he raped her little sister, Mack married Jaycee and they moved to Rosharon, Texas with Jaycee's family.  Natalie moved with them, but she did not remain silent indefinitely.  Nearly a decade after the move, Natalie told her family that Mack had abused her, confronting Mack directly in the process.  Jaycee, however, leapt to Mack's defense, and threatened that if Natalie reported him to the police, she would report her for stealing scratch-off lottery tickets from Jaycee and Mack's store.  Natalie backed down.

Around that same time, Mack and Jaycee adopted six siblings, including three girls who became victims: Brenda (11), Laura (9), and Leah (6).  Right after the children moved in with their new parents, Mack started "touching" both Brenda and Laura.

The abuse was abhorrent.  Laura remembers that one night, as she slept next to Brenda, she woke up to Mack touching her genitals.  Mack stripped her naked, and Laura felt him push his hand "inside [her] body."  The assault was so "scary" that Laura kept silent and tried to forget about it.  On another night, Brenda awoke to Mack touching her, pulling down her pants, and raping her.  He held her down and ignored her pleas for him to stop.  Jaycee came to the door.  When she opened it, she saw that Mack and Brenda were naked from the waist down.  When Brenda told Jaycee that Mack had been raping her, she promised that she would "handle it" and everything would be fine.

Everything was not fine, and Jaycee apparently knew it. She confided in her sister-in-law Donna that she and Mack had gotten into an argument and that he had packed his bags and left to live with a friend in Alabama. Jaycee also said that she had found a pair of "wet" underwear in the laundry belonging to Brenda. Donna urged Jaycee to seek medical treatment for Brenda and to report the abuse. Jaycee told Donna the next day that she made the appointment.

But when Donna checked in with Jaycee later, Jaycee had changed her tune. She told Donna that she now doubted Brenda because of her "disability" (Brenda struggled to read and write) and told Donna that she planned to go to Alabama to help Mack find a place to open a donut shop. That seemed odd to Donna because of an earlier conversation with Mack, who had told her after he started receiving government benefits to support his adopted children, "Oh, since I got the kids, I don't need to work anymore." Jaycee never reported the abuse. For a long time, neither did Donna.

Around that same time, Jaycee called her brother (Donna's husband) telling him that Mack had a gun and was about to commit suicide. When he rushed to the house to talk Mack down, Mack admitted that "he had done something really bad and he would not go to jail for it."

He did not go to jail then. Nor did he kill himself. Instead, the Doaks quickly moved away from Jaycee's family to Butler, Alabama. In their new home, Jaycee's treatment of Brenda

deteriorated.  She began hitting her and calling her a "ho" and a "slut."  Brenda was no more than 13 years old.

Within a year, the family moved again, this time to Florida. The abuse continued.  Mack followed Brenda to the laundry room, pulled down her pants, and raped her.  Brenda again asked Jaycee for help.  This time Jaycee did not comfort Brenda; instead, she insisted that she was lying and that her "disability" was "playing tricks" on her.

Mack often used the Doaks' bedroom for cover.  It was off limits for the children (unless they were with Mack of course) and both Brenda and the girls' brother Eddie noticed that Mack would call Laura or Leah to the bedroom and then play music loudly. Brenda recognized the tactic from her own experience and feared that Mack was also abusing her little sisters.

He was.  Laura testified that Mack once called her to his room and locked the door behind her.  He then touched her "private area" and, as Laura testified, put his penis "inside [her] private part."  Mack also touched the younger girls while they were doing the dishes, and once woke Leah and penetrated her with his finger.  All three of the girls told Jaycee about Mack's abuse.  When they did, Jaycee had an argument with Mack—but the sexual abuse continued.  And instead of helping the girls, Jaycee became "more strict," yelling at them and hitting them.

Two years after they arrived in Florida, it was time to move again, this time to Thomasville, Alabama.  Mack's abuses continued.  Leah, the youngest sister of the three, testified that he would touch her in the kitchen and call her to his bedroom where

he would force her to have sex with him.  And Laura recalled that one day, early in the morning, Mack picked her up and put her on the washer or the dryer in the laundry room.  He took off her bra and began touching her breasts.  This time her younger brother Eddie walked in.  Eddie remembered seeing Mack with his pants down, one hand on Laura's thigh and another on her genitals.  Mack told Eddie to go back to sleep.  Eddie complied; he testified that he "would have been hurt if [he] didn't listen."  Mack told him to forget what he'd seen, and he stayed quiet.  His fears were well-founded; at least one time Mack gave Eddie a "hard slap" on the face, and Jaycee sometimes hit him with a wooden spoon.

Mack also abused Brenda in Thomasville.  He woke her and ordered her to do laundry in his room, but instead he raped her.  Brenda went to Jaycee again.  But Jaycee again dismissed her, accusing her of lying and calling her names.  She also hit her.  When a teacher's aide at school noticed the bruises on Brenda's arms and asked her what had happened, Brenda revealed that Jaycee had hit her.  The very next day the family left for Monroeville, Alabama; they had been in Thomasville for less than a year.

After the move, nothing changed.  Mack raped Brenda in the house's storage room when she was putting away groceries, and again when she was doing laundry.  He called Laura to his room and, as Laura said, his "private area went into mine."  Mack continued to "force [Leah] to have sex with him."  Laura again told Jaycee about the abuse.  At first Jaycee assured Laura that she would be okay, but that attitude did not last; instead she hit Laura and otherwise treated her poorly.

The family also took two trips while they lived in Monroeville. On the first, to Cambodia, Mack and Jaycee brought Brenda, who was told that one purpose of the trip was to marry her to one of Mack's cousins. No marriage plans were set. But Mack caught her alone while she was getting dressed and began groping her. That time Brenda escaped; she managed to leave "really quick because the door was still open."

The second trip was to Rhode Island, a visit to extended family. The Doaks' large van was set up with a mattress in the very back behind rows of seating for the rest of the family. Mack took advantage of the long drive to abuse the girls. He inappropriately touched Brenda while they were sitting in the back seat, and he brought Laura back to the mattress and groped her. After they arrived in Rhode Island, Mack also grabbed Brenda's pubic area while the two were alone in a hotel elevator.

The abuse continued when they returned to Alabama. Mack raped Brenda; Brenda told Jaycee; and Jaycee did nothing. "[T]ired of being sexually touched and abused," Brenda finally told another family member—Jaycee's brother, Lay Thet. Jaycee's family held a meeting and decided to put up cameras in the Doaks' house. Not long after, the family reported the abuse to the police, who arrested both Mack and Jaycee. As part of the investigation, police recovered a semen-stained mat from the Doaks' house. The mat contained DNA traceable to Mack and Brenda, but not to Laura or Leah.

Mack was charged with six counts of transporting children with the intent that they "engage in sexual activity for which any

person can be charged with a criminal offense," in violation of 18 U.S.C. § 2423(a). Jaycee was charged with aiding and abetting that activity. *See* 18 U.S.C. § 2. The indictment also charged Mack with three counts of aggravated sexual abuse under 18 U.S.C. § 2241(c), specifically crossing a state line "with intent to engage in a sexual act" with a child under the age of 12. The indictment included two charts, listing the different trips involving "Victim 1" Brenda, "Victim 2" Laura, and "Victim 3" Leah:

18 U.S.C. § 2423(a) Transportation of minors

| Count | Date | Individual | Transportation of Minor |
|---|---|---|---|
| 1 | August 2014 | Victim 1<br>Victim 2<br>Victim 3 | From Butler, Alabama to Florida. |
| 2 | November 2016 | Victim 1<br>Victim 2<br>Victim 3 | From Florida to Thomasville, Alabama. |
| 3 | November 2017 | Victim 1 | From Monroeville, Alabama to Cambodia. |
| 4 | December 2017 | Victim 1 | From Cambodia to Monroeville, Alabama. |
| 5 | December 2017 | Victim 1<br>Victim 2<br>Victim 3 | From Monroeville, Alabama to Rhode Island. |
| 6 | December 2018 | Victim 1<br>Victim 2<br>Victim 3 | From Rhode Island to Monroeville, Alabama. |

18 U.S.C. § 2241(c) Aggravated sexual abuse

| Count | Date | Person | Travel by Defendant |
|---|---|---|---|
| 7 | August 2014 | Victim 2 | From Butler, Alabama to Florida. |
| 8 | August 2014 | Victim 3 | From Butler, Alabama to Florida. |
| 9 | November 2016 | Victim 3 | From Florida to Thomasville, Alabama. |

Before trial, the district court explained how it would instruct the jury to assess Mack's intent under § 2423(a). The court proposed referring the jury to Alabama laws that criminalized the sexual abuse Mack intended during each covered trip to inflict on the girls. Mack objected, arguing that "the Alabama offenses had varying degrees and that he had not received notice of which degree the court intended to instruct the jury on." The government responded with its own last-minute proposal, announcing that it would not rely on Alabama law. Instead, it planned to rely on 18 U.S.C. § 2423(b), which outlawed "Travel With Intent To Engage in Illicit Sexual Conduct," and § 2423(c), which barred "Engaging in Illicit Sexual Conduct in Foreign Places," to identify the criminal sexual abuse that Mack had intended to inflict on the girls. The Doaks did not object to that proposal.

At trial, the girls and other family members testified about Mack raping and sexually abusing the girls, as well as Jaycee's role in concealing the abuse. The jury convicted both Mack and Jaycee of all counts. The district court sentenced each of them to 10 years' imprisonment for the transportation offenses, and Mack received

an additional 30 years' imprisonment for the aggravated-sexual-assault offenses.  The court also ordered them to pay $150,000 in restitution to a conservatorship for the victims' future therapy and $75,000 in restitution to Jaycee's sister Natalie to cover the costs that she had accrued during 18 months of caring for the children. Finally, the court imposed a special assessment of $30,900 on Mack, and of $25,600 on Jaycee.

The Doaks appeal their convictions, and Mack challenges the restitution order and his special assessment.  For its part, the government challenges Jaycee's sentence as unreasonably low.

## II.

The Doaks begin with their indictment.  They argue that the charges against Mack for transporting the girls (the § 2423(a) offenses) must be dismissed because the government forgot to include in the indictment the statutes criminalizing the sexual abuse that Mack intended to commit.  It was not enough, they say, to charge Mack with a general intent to commit criminal sexual abuse.  The indictment needed to refer to specific sex-abuse statutes to inform the Doaks of the accusations Mack faced.

The Doaks also argue that the government only made things worse when it tried to select specific sex-abuse statutes.  The two statutes that the government eventually picked, they say, did not criminalize sexual abuse at all—but only banned travel motivated by illicit sex.  In their view, the government ended up charging Mack with transporting the girls with an intent to have them illegally travel—which, at least under § 2423(a), is no crime at all. But neither argument holds up.

## A.

When a defendant challenges the sufficiency of an indictment, our review is de novo. *United States v. Steele*, 178 F.3d 1230, 1233 (11th Cir. 1999). An indictment is sufficient if it "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Wayerski*, 624 F.3d 1342, 1349 (11th Cir. 2010) (quotation omitted). These requirements derive from "the Sixth Amendment's guarantee of notice to the accused of the nature and the cause of the accusation, and the Fifth Amendment's assurance that a grand jury will return an indictment only when it finds probable cause for all elements of the crime." *Id.* Simplicity is acceptable; an indictment is constitutionally sufficient when it "tracks the wording of the statute, as long as the language sets forth the essential elements of the crime." *Id.* at 1350 (quoting *United States v. Ndiaye*, 434 F.3d 1270, 1299 (11th Cir. 2006)).

The Doaks argue that their indictment fails two of these requirements. *First*, they argue that the government omitted an essential element of the offense of transporting the girls for sexual activity: the independent statutes that criminalize the sexual activity Mack intended to commit. *See* 18 U.S.C. § 2423(a). The Doaks say that the statutory language about intent is too broad on its own because it "encompasses a multitude of crimes." *Second*, the Doaks argue that omitting the sexual-abuse statutes also

deprived them of notice of the charges they faced. Neither challenge succeeds.

To start, the Doaks' indictment included all the statutory elements when it charged Mack for transporting the girls with the intent to sexually abuse them. It alleged that Mack "[1] knowingly [2] transported an individual who had not attained the age of 18 years [3] in interstate and foreign commerce, with [4] intent that such individual engage in sexual activity for which any person can be charged with a criminal offense." *See id.*

The critical question, then, is whether the statutes criminalizing the intended sexual activity are themselves additional elements or only means of proving the element of intent. We must draw this distinction because an indictment need not provide those facts showing which particular path the defendant took to commit a crime—what it must do is include the elements of the crime itself. *Wayerski*, 624 F.3d at 1350. The elements are required, in other words, but the means are not (at least for sufficiency purposes). Indeed, it is not unusual that "several possible sets of underlying brute facts" could satisfy an element of a crime. *United States v. Jockisch*, 857 F.3d 1122, 1127 (11th Cir. 2017) (quotation omitted).

We confronted substantially the same issue in *United States v. Jockisch*. There the defendant was charged with attempting to persuade a minor to engage in "any sexual activity for which any person can be charged with a criminal offense." *Id.* at 1124 & n.1; *see* 18 U.S.C. § 2422(b). Jockisch argued that the jury needed to unanimously agree on which state criminal offense he had attempted to violate because that crime was an element of the

enticement offense. *Jockisch*, 857 F.3d at 1127. We disagreed, explaining that the state offenses were only *means* of showing that the pursued sexual activity was criminal. *Id.* at 1131. The jury did not need to be "absolutely sure which precise sex act" the defendant "would have actually pursued"; it only needed to be able to "reasonably infer that any of these acts would have been unlawful." *Id.* The element was criminal sexual activity as a general category, and the specific state statutes were only means by which the jury could identify that the sexual activity was criminal.

The same is true here. The intent language in the § 2423(a) transport-for-sexual-activity offense mirrors the wording of the § 2422(b) enticement offense. And like in *Jockisch*, the Doaks' convictions turned on whether Mack intended the girls to commit some criminal sexual act—not whether he ultimately forced them to commit one specific criminal sex act or another. *Id.* at 1128–29. There were plenty of means of violating the two statutes, and the government did not omit an element of the offense by failing to list every possible law forbidding the sexual acts that Mack had in mind.

There were, of course, many such laws. Sexual activity with children is banned under numerous federal and state criminal statutes. It is, to be more plain, never allowed, and that fact is broadly understood. Florida, Alabama, and Rhode Island, the States where Mack's conduct took place, criminalize sexual intercourse with—or rape of—young children. *See* Ala. Code § 13A-6-61(a)(3) (under 12); Ala. Code § 13A-6-62 (under 16); Fla.

Stat. § 794.011; R.I. Gen. Laws § 11-37-8.1 (under 14); R.I. Gen. Laws § 11-37-6 (14 to 16 if assailant over 18).  And all three States also criminalize sexually touching children's genitals or digitally penetrating them.  Ala. Code § 13A-6-67(a)(2) (under 16); Fla. Stat. § 800.04(5) (under 16); R.I. Gen. Laws § 11-37-8.3 (under 14); R.I. Gen. Laws § 11-37-4(2) (sexual contact using force, surprise, or coercion).  Because all of these independently illegal acts are means of satisfying the same element—intent to criminally sexually abuse a minor—including the statutory language in the indictment was enough.

Even so, the Doaks argue, the indictment should still be dismissed because omitting those statutes left them without notice of the nature of the intent accusation against Mack.  When we assess an indictment to decide whether it provided sufficient notice, we read it "as a whole" and give it "a common sense construction."  *United States v. Phillips*, 4 F.4th 1171, 1176 (11th Cir. 2021) (quotation omitted).

We see no such ambiguity here.  When the indictment charged the Doaks with transporting the girls to engage in illegal sexual activity, it listed six trips between Alabama, Florida, Cambodia, and Rhode Island; the dates of each trip; and the victims Mack transported.  *See* 18 U.S.C. § 2423(a).  Mack was also charged with crossing state lines on two of those same trips with the intent to engage in a sexual act with the two younger girls.  Read as a whole, the indictment divulged the key detail about the criminal sexual activity at issue—that Mack intended to sexually abuse the girls himself.  The Doaks were fully informed that Mack was

accused of transporting his adopted daughters with the intent to sexually abuse them and that Jaycee was accused of aiding and abetting that transport.  The Doaks were on notice that Mack's sexual interest in and abuse of his adopted daughters underpinned the charges against them.

To be sure, it is best practice to include the statutes criminalizing the sexual activity that the defendant planned to inflict on the transported child.  *See, e.g.*, *United States v. Nicholson*, 24 F.4th 1341, 1349 (11th Cir. 2022) (indictment citing Florida and North Carolina sex crimes statutes).  That best practice was not followed here.  Even so, the indictment was detailed enough to notify the Doaks of the charges against them.

**B.**

The Doaks also claim to have found a jurisdictional flaw in the indictment.  The government, they say, failed to state an offense against them because it used a statute that prohibits "travel with intent to engage in illicit sexual conduct" and one that bars "engaging in illicit sexual conduct in foreign places" to identify the unlawful sexual activities Mack intended to commit when he transported the girls in violation of § 2423(a).  *See* 18 U.S.C. § 2423(b), (c).  The Doaks argue that instead of banning "prostitution or sexual activity" those statutes criminalize only travel.  In their view, that means the indictment not only failed to charge Mack with intending to sexually abuse the girls, but also charged Mack with no crime at all.

Though the Doaks failed to raise this issue below, we review the claim de novo because it challenges our subject matter

jurisdiction.  *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019).

A district court lacks subject matter jurisdiction over an indictment only when it "alleges facts that conclusively negate the existence of any offense against the laws of the United States." *United States v. Leonard*, 4 F.4th 1134, 1142 (11th Cir. 2021) (alteration adopted and quotation omitted).  That occurs "when the alleged crime simply did not exist in the United States Code; when the conduct alleged undoubtedly fell outside the sweep of the cited statute; and where the violation was of a regulation that was not intended to be a law for purposes of criminal liability." *Id.* (quotations omitted).  The Doaks claim that their indictment fails on the first ground.

It does not, for the very plain reason that it does not include the statutory provisions that the Doaks complain render it insufficient to charge a federal crime.  In fact, the Doaks' complaint about the indictment all along has been that it *omitted* the underlying statutes.  And because those statutes were omitted, the jurisdictional argument that they were wrongly included in the indictment cannot succeed.  "So long as the conduct described in the indictment is a criminal offense," even the complete "omission of an element does not vitiate jurisdiction." *United States v. Moore*, 954 F.3d 1322, 1336 (11th Cir. 2020).  Because the § 2423(a) portion of the indictment properly charged a federal crime, the Doaks' jurisdictional challenge falls short. *See id.* at 1334.

### III.

Moving past the indictment, the Doaks challenge the sufficiency of the evidence.  They both say that Mack had innocent intent when the family traveled between Alabama and Florida, and when he brought his adopted daughters along with him on the trips to Florida, Alabama, Cambodia, and Rhode Island.  For her part, Jaycee argues that even if Mack had a "hidden purpose" of sexually abusing the girls, she was merely traveling with her family; according to her, the government failed to prove that she "wished" Mack would "succeed" in abusing their adopted daughters.  These sufficiency arguments fail.

### A.

We review de novo whether sufficient evidence supports a conviction.  *See United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010).  We resolve "all reasonable inferences in favor of the verdict" and consider the evidence "in the light most favorable to the government."  *Id.* (quotation omitted).  And the evidence is insufficient only if "no reasonable trier of fact could find guilt beyond a reasonable doubt."  *Id.*

To establish intent, the government had to prove that Mack's motive or purpose for traveling (the § 2241(c) offenses) and for bringing the girls along on the different trips (the § 2423(a) transport offenses) was to sexually abuse them.  *See Nicholson*, 24 F.4th at 1349–50; *Farley*, 607 F.3d at 1335.  That "illicit behavior must be one of the purposes motivating the interstate transportation"; it "need not be the dominant purpose," but it "may not be merely incidental to the trip."  *United States v.*

*Perkins*, 948 F.3d 936, 939 (8th Cir. 2020) (quotation omitted). Further, an alternative "plausible innocent explanation" is not enough to prove that the conduct was not motivated by illicit sexual activity. *Farley*, 607 F.3d at 1335.

The Doaks argue that the government cut corners by presenting evidence of Mack's regular "sex with minors who lived in his home" alongside unrelated evidence that the family went on a few trips. In their view, nothing "linked the family's travel to the alleged sexual abuse." In fact, they say, the "overwhelming evidence revealed that the purpose of the travel was financial or social."

Although the Doaks have offered other reasons for their travels—say, to open a new business in Florida or to visit family in Rhode Island—the jury could have readily concluded that Mack intended to bring the girls along so that he could sexually abuse them. Unsurprisingly, defendants charged with traveling to have sex with children in violation of § 2241(c) are often able to produce innocent purposes for their trips; Mack cannot elude liability by claiming that he had other reasons for traveling. *See id.* The question is whether Mack's actions were motivated, at least in part, by his desire to sexually abuse the girls.

Starting with the three charges that Mack moved to facilitate the sexual abuse of the younger girls, sufficient evidence establishes that Mack moved the family between Alabama and Florida to keep his abuse concealed. *See* 18 U.S.C. § 2241(c). Before Mack and Jaycee adopted the girls, the couple had lived in Rosharon, Texas for around a decade. But when Mack began sexually abusing the

girls, he also began to frequently uproot the family. Several of the moves coincided with an imminent possibility that his sexual abuse would be exposed. For example, as soon as Jaycee found out that Mack was raping the girls—and discussed the issue with her sister-in-law—the Doaks moved to Alabama, away from Jaycee's family in Texas. And the day after Brenda's teacher started asking questions about bruises on Brenda's arm, the family moved from Thomasville, Alabama to Monroeville, Alabama.

The jury surely could have concluded that Mack moved to keep his adopted daughters isolated and avoid detection. Moving, paired with other harsh treatment, kept them silent. Jaycee, for example, verbally and physically abused the girls, escalating her mistreatment whenever the girls asked her to protect them from the abuse. A reasonable jury could identify the pattern and conclude that staying on the move was part of Mack's plan to sexually abuse the girls. *See United States v. Foster*, 878 F.3d 1297, 1305 (11th Cir. 2018).

The charges that Mack transported the girls with the intent to sexually abuse them referenced a broader set of trips, including a short trip over Christmas to visit family in Rhode Island and the trip to Cambodia. Because § 2423(a) is a transport offense, not a travel offense, we ask why Mack brought the girls on the trips, not why he planned the trips in the first place. So even if Mack can provide innocent reasons for taking the trips, we consider all aspects of his intent in bringing the girls along with him.

And here Mack's consistent desire to sexually abuse the girls provides the answer. *See Nicholson*, 24 F.4th at 1349–50. The

evidence leaves no doubt that Mack dominated the girls' lives and coerced them into situations where he could sexually abuse them. Sometimes he called them into his bedroom and played loud music to disguise the fact that he was raping them.  He would follow them into the laundry room or the storage room and rape them there too.  Indeed, the jury heard evidence that he groped the girls wherever he could—in the kitchen as they washed dishes, in the back seat of the family van, and even in a public elevator.

A reasonable jury could easily conclude that Mack kept the girls close by so that he could abuse them on demand.  And it follows that Mack brought the girls with him on the various trips to have them accessible when he wanted to grope or rape them. The jury had sufficient evidence to convict Mack of traveling and bringing the girls with him to sexually abuse them.

## B.

Jaycee separately challenges the sufficiency of the evidence of her intent to aid and abet Mack's violation of § 2423(a).  Under 18 U.S.C. § 2, a person who aids and abets a criminal act can "be found guilty as a principal." *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015) (quotation omitted).  But such criminal liability follows only if she "contributed to and furthered the offense" and "intended to aid in its commission." *Id.* Jaycee does not dispute that she helped Mack transport the girls on their trips. But she claims that she did not intend to help Mack violate § 2423(a)—she says she disapproved of his rampant sexual abuse.

But it does not matter whether Jaycee participated in the trips "with a happy heart" or with "a sense of foreboding."

*Rosemond v. United States*, 572 U.S. 65, 80 (2014). For "purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.* at 77.

Jaycee does not dispute that she knew that Mack consistently abused the girls or that it started as soon as the Doaks adopted them. In Texas, she interrupted Mack raping Brenda in the girls' bedroom. And while the Doaks lived in Florida and Alabama, Brenda asked Jaycee for help more than once after Mack raped her. Laura and Leah also shared with Jaycee that Mack was raping them. It follows that a reasonable jury could conclude from this evidence that Jaycee knew that one reason Mack brought the girls with him on the various trips was to sexually abuse them. *Cf. Nicholson*, 24 F.4th at 1349–50. And despite knowing what the girls would suffer, she helped Mack transport them anyway.

What's more, Jaycee was no passive observer. A reasonable jury could easily conclude that Jaycee helped Mack keep his abuse a secret. She began abusing the girls herself—not sexually, it's true, but physically and verbally. She hit the girls, and called them derogatory, sexualized names. She silenced them to conceal the sexual abuse. Though Jaycee may have argued with Mack on a few occasions and she almost took Brenda to the doctor after talking with her sister-in-law—in the end, she refused to help. The evidence of her initial resistance is not enough to preclude the jury from finding that she acted with intent. *See United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985) (proof of other acts can

reveal a lack of intent).  The evidence, in short, was sufficient to support her conviction for aiding and abetting Mack's abuse.

## IV.

The Doaks also argue that the district court mishandled several evidentiary issues.  The court refused to admit evidence that Jaycee's adult brother Lay also had sex with Brenda.  It allowed expert testimony from an FBI forensic interviewer on debriefing children suspected of suffering sexual abuse.  It admitted a video of Mack slapping Eddie to show that the Doaks used violence to silence the children and keep Mack's sexual abuse secret.  Even if these errors were individually harmless, they say, the cumulative effect warrants reversal.  But none of those evidentiary decisions, in isolation or together, amount to reversible error.

## A.

The Doaks say that the district court should have allowed them to present evidence that Mack was not the true abuser.  Their theory of the case was that family members had fabricated the sexual abuse allegations against Mack.  Physical differences between the girls would show, they asserted, that only Brenda had experienced vaginal intercourse, and they wanted to admit testimony that Lay, Jaycee's brother, was her abuser.  *See United States v. Culver*, 598 F.3d 740, 749 (11th Cir. 2010).

Under Federal Rule of Evidence 412, "evidence offered to prove that a victim engaged in other sexual behavior" is generally inadmissible.  Fed. R. Evid. 412(a)(1).  But exceptions apply, including for "evidence whose exclusion would violate the

defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C).[2] Defendants have a right "under the Fifth and Sixth Amendments to introduce evidence in their defense." *Culver*, 598 F.3d at 749 (quotation omitted). And while the district court retains "wide latitude to impose reasonable limits on testimony" based on concerns such as "harassment, prejudice, [or] confusion of the issues," those restrictions may not be "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (alterations adopted and quotations omitted). We review a district court's application of Rule 412 for an abuse of discretion. *Id.*

Lay's sexual relationship with Brenda, the Doaks say, would have revealed why cameras were put up in the house and why Lay went to the police and accused Mack of sexual abuse—to get Mack out of the way and to conceal his own acts of statutory rape. Mack also introduced evidence that, of the three sisters, only Brenda's hymen was not intact. The purpose of this evidence was to suggest that only she had had vaginal intercourse. Mack wanted to

---

[2] Mack also argues that he was entitled to introduce the evidence that Lay had sex with Brenda to explain why her hymen was not intact under Rule 412(b)(1)(A), which permits "evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence." But the exception applies only when the government has "directly or indirectly asserted" that certain "physical evidence originated with the accused." Fed. R. Evid. 412 advisory committee's note to 1994 amendment. Here the government did not even introduce the physical examinations of the three girls—Mack did. Mack cannot fit the evidence through this exception.

emphasize the story that Lay was the real abuser; he had not demonstrated a sexual interest in the younger sisters.

We need not decide whether the district court erred excluding the evidence, because at most it was only a harmless error. To demonstrate the harmlessness of a constitutional error, the government must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020) (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967)). If the government leaves us "firmly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence," then we will conclude that the error was harmless. *Cape v. Francis*, 741 F.2d 1287, 1294–95 (11th Cir. 1984).

A review of the record shows that any error here was indeed harmless. For one, the district court did not keep the Doaks from arguing that other family members had ulterior motives in accusing Mack of sexual abuse. It even allowed them to introduce the fact that "Lay had a sexual interest in Brenda." It recognized that they needed a chance to explain "why the cameras were installed" at their home, and to support their claim that Lay both falsely reported Mack to the police and influenced Brenda's siblings "to make the same allegations." The court also allowed the Doaks to question Natalie about Lay's relationship with Brenda. When she denied having any concerns, they impeached her using her text messages, which showed that she was monitoring Lay's interactions with Brenda. Lay and Jaycee's father also testified he

noticed Lay "sitting close by" Brenda and that Lay admitted having "a sexual interest in Brenda."

The government also produced physical evidence confirming that Mack had sexually abused the girls. A semen-stained mat was traced to Mack and Brenda, confirming Brenda's testimony that Mack had raped her in the storage room. And the jury heard evidence that discounted any suggestion by Mack that the fact that Laura's and Leah's hymens were still intact meant their testimony that they were raped was false. A physician (that Mack called as a witness) noted that a child might believe that a man was having sex with her if his penis was simply touching her vaginal opening, rubbing against it, ejaculating against it, or slightly entering it—none of which would necessarily break the hymen.

The girls' testimony of Mack's repeated sexual abuse along with the government's other evidence leaves us no doubt that the jury would have convicted the Doaks even if it had heard testimony that Lay had also committed statutory rape against Brenda. So even if it was error to exclude evidence that Lay had sex with Brenda, the error was harmless.

## B.

The Doaks also object to the FBI forensic interviewer's expert testimony. We review the district court's decision to admit expert testimony for abuse of discretion. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). The proponent of expert testimony bears the burden of showing that its expert is qualified, that the testimony is reliable, and that the explanations will help the jury. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.

2004) (en banc). To be admissible, "proposed expert testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Id.* at 1261 (alterations adopted) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). When a witness relies on experience, she must (1) explain how it leads to and supports the conclusion she has reached and (2) show how it can be reasonably applied to the facts. *Id.* (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

The Doaks claim that the expert's testimony about how "children disclose incidents of abuse" was not shown to be reliable because she failed to explain how her experience supported her opinions. They say that her testimony was not helpful to the jury—that she only provided "common sense observations" and that those observations prejudicially bolstered the girls' credibility.

We disagree. The expert witness explained the forensic-interview process and described how children pulled out of suspected sexual-abuse situations disclosed that information. Her testimony about the process was reliable because she had handled six thousand such interviews herself. Her firsthand experience equipped her to identify trends in how children process abuse and disclose it. Because her testimony described her experience interviewing children suspected to be sex abuse victims, it offered a reliable framework to provide to the jury.

And it was a helpful framework, too. As the jurors prepared to listen to Brenda, Laura, and Leah testify about being raped repeatedly and suffering traumatic sex abuse, the expert testimony provided context to help the jurors understand why the girls

responded differently.  *See, e.g.*, *United States v. Aungie*, 4 F.4th 638, 645 (8th Cir. 2021).  It helped the jurors assess why Brenda disclosed the abuse almost immediately and only to Jaycee, and why it took longer for the younger girls to ask for help.

The Doaks' last resort is to claim that the testimony was prejudicial and should have been excluded under Rule 403.  But as explained above, the expert testimony helped the jury, and we conclude that its benefit was not substantially outweighed by any prejudicial effect it might have had.  *See* Fed. R. Evid. 403.  The district court thus did not abuse its discretion when it admitted the expert testimony.

## C.

The district court also acted within its discretion when it admitted a video of Mack slapping Eddie, the girls' brother, to show that "the children did not report the alleged sexual abuse because they were afraid of physical and verbal abuse if they did report."  Mack says the slap was an unrelated act, requiring exclusion as improper character evidence under Rule 404(b) or as unfairly prejudicial under Rule 403.

The video was neither of those.  For one thing, the combination of threats and physical abuse the adopted children suffered at the hands of the Doaks was "an integral and natural part of an account of the crime" and were "necessary to complete the story of the crime for the jury." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation omitted).  It was not character evidence.  The physical abuse displayed in the video helped explain why the Doaks' adopted children felt threatened by

Mack and Jaycee, which may have contributed to the years they silently endured his sexual abuse.  The video was thus admissible despite the limits of Rule 404(b).  And the district court's proper limiting instruction—admonishing the jury not to rely on it as "evidence that they committed the acts charged in the indictment"—cured any prejudice.  *See Barton*, 909 F.3d at 1338.

### D.

That leaves Mack's claim that cumulative error infected the trial.  "We review the cumulative impact of trial errors de novo, and reverse only if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial."  *United States v. Maurya*, 25 F.4th 829, 842 (11th Cir. 2022) (quotation omitted).  But only one (harmless) error remains at most, and a harmless error alone cannot have rendered Mack's trial unfair.  *Id.*

### V.

The parties also raise several challenges to the district court's sentencing decisions—the government to Jaycee's term of imprisonment, and Mack to various financial penalties and assessments.  We consider each below.

### A.

The government argues that Jaycee's sentence—the statutory minimum—is substantively unreasonable.  We review the substantive reasonableness of a sentence for an abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).  A district court strays beyond the range of reasonable sentences when, based on the 18 U.S.C. § 3553(a) sentencing factors, it "(1) fails to afford consideration to relevant

factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* (quotation omitted).

The government says that the district court veered from the § 3553(a) factors when it cut Jaycee's sentence based on its doubts about sufficiency (despite its own ruling that the evidence was sufficient) and the fact that she did not rape the girls herself. But § 3553(a) directs the sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Jaycee helping with transport and concealing the sexual abuse rather than raping or groping the girls herself is a relevant circumstance the district court could at least consider. Whether we would put so much weight on these facts is not the question—the abuse of discretion standard offers wide latitude for district courts. *Irey*, 612 F.3d at 1189.

The government protests that the court's consideration of those facts conflicted with *United States v. Jayyousi*, where we disapproved of reducing sentences for inchoate crimes on the principle of "no harm, no foul." *See* 657 F.3d 1085, 1118 (11th Cir. 2011). It is true that Jaycee must not receive better treatment merely because she only helped Mack—an aider and abettor is as culpable as and "punishable as a principal." 18 U.S.C. § 2. If the district court had reduced Jaycee's sentence on the view that she only helped Mack rather than violating § 2423(a) herself, that would have been a mistake. But the district court did not do so. Though it questioned the sufficiency of the evidence for Jaycee's

conviction, it properly suggested that appeal was the venue for airing those concerns.  The district court thus avoided weighing improper factors.

The government also argues that the district court overlooked Jaycee's physical abuse of the children and her lack of remorse when assessing the nature and circumstances of her offense.  The record shows otherwise.  The court discussed how Jaycee "was physically abusive to the children" and "fostered an atmosphere" which allowed Mack to sexually abuse them.  And it considered how she "agreed to protect their welfare" when she adopted them but then abdicated that responsibility.

The government's final criticism is that the district court prioritized the wrong factors.  And that is certainly a close call here. Each of the girls testified that Mack's actions went far beyond a transportation offense—throughout their years living with him, he would on a whim pull them into his room or the laundry room and rape them.  Jaycee aiding and abetting Mack enabled him to inflict serious harm on the girls.  She even physically abused them herself. While it may be unlikely that Jaycee will repeat this behavior, Jaycee's sentence should show that such cooperation will be firmly punished.

But when reviewing for an abuse of discretion, there are "occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Irey*, 612 F.3d at 1189 (quotation omitted).  This is one of those cases.  Jaycee's sentence falls at the very bottom of what could be a reasonable sentence—indeed, it is the statutory minimum of the offense.  18

U.S.C. § 2423(a).   Given the discretion district courts have in sentencing, though, we cannot conclude that this sentence is unreasonable.

## B.

Mack contests the special assessment the district court imposed under 18 U.S.C. § 3014.  He claims that the court clearly erred when it held that he was not indigent, because he "has a negative net worth, limited accessible assets, no current source of income, and no ability to pay a fine."  We review the district court's decision that a defendant can afford a special assessment for clear error.  *See United States v. McGuinness*, 451 F.3d 1302, 1307 (11th Cir. 2006).

The district court held that Mack was not indigent because he and Jaycee previously failed to disclose that they owned real property in Rosharon, Texas.  (After the property was discovered, it was sold and the proceeds were allocated to cover restitution.)  "Evidence that a defendant has failed to disclose" assets may "support a determination that the defendant is able to pay a fine with those undisclosed assets."  *Id.* at 1308 (quotation omitted).  So it was not improper for the district court to rely on Mack's omission to conclude that he was not indigent and levy a special assessment.

## C.

Mack also argues that requiring him to pay $225,000 in restitution was unreasonable.  The district court concluded that therapy for the girls would cost at least $150,000, and that the Doaks needed to pay Natalie $75,000 for caring for the children for the 18 months leading up to sentencing.  Mack claims that the

therapist's estimate of the girls' therapy costs was unreasonable because she practiced in Alabama, not Texas where the girls live. And he argues that the living expenses Natalie provided were inflated by the costs of caring for her own children and the siblings of the victims; he also argues that the amount did not factor in the Social Security benefits two of the girls received.

We review a district court's award of restitution de novo, but review underlying factual findings for clear error. *United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006). Mack challenges only factual findings.

The purpose of restitution is to make victims whole by reimbursing "the amount of loss *actually* caused by the defendant's conduct." *United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (quotation omitted). That includes estimated therapy costs, "as long as the award reflects a reasonable estimate of those costs and is based on record evidence." *United States v. Osman*, 853 F.3d 1184, 1190 (11th Cir. 2017).

The district court calculated the girls' expected therapy costs based on the testimony of a licensed clinical psychologist who specializes in child sexual abuse victims. She testified that the girls should receive multiple years of weekly therapy followed by sporadic therapy as needed throughout the rest of their lives. The girls exhibited symptoms so severe that she recommended care from a "doctoral level provider who has experience working with trauma." In Mobile, Alabama, those services would cost around $165 per hour. Even though the girls had moved from Alabama to Texas, the district court did not clearly err when it relied on this

testimony to calculate the girls' therapy costs. $150,000 was a reasonable estimate.

The same cannot be said of calculation of the living expenses. Natalie estimated that she spent between $3000 and $4000 each month on living expenses—but admitted that the amount is what she paid for all eight children in her care. The district court did not account for that fact and ordered the Doaks to pay Natalie over $4000 per month. Even though we do not impose a rigid formula for calculating restitution, the government must provide "reliable and specific evidence." *Sheffield*, 939 F.3d at 1278 (quotation omitted). And here the specific evidence shows that the district court's calculation was too high. It was clear error to order the Doaks to pay more than what Natalie admitted was an overestimate of the living expenses.

★ ★ ★

Mack Doak traveled with three young girls intending to sexually abuse them. And despite knowing that her husband was raping and abusing the girls, Jaycee Doak committed physical and mental abuse of her own rather than helping the girls as she sometimes promised. What she did help with was family travel, which further perpetuated the abuse. Though the Doaks raise numerous challenges to the indictment, to the sufficiency of the evidence, and to the district court's evidentiary decisions at trial, none warrant reversal.

We therefore **AFFIRM** the Doaks' convictions. We also **AFFIRM** Jaycee Doak's sentence and Mack Doak's special assessment, **AFFIRM IN PART** the restitution order as to therapy

19-15106                Opinion of the Court                35

costs and **VACATE IN PART** as to living expenses, and **REMAND** for proceedings consistent with this opinion.