[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10709

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JORDAN JYSAE PULIDO,
ROBERTO SANTANA JIMENEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00292-VMC-CPT-1

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

NEWSOM, Circuit Judge:

Jordan Pulido started an online relationship with a Croatian girl, I.G., and with the aid of his father, Roberto Jimenez, eventually traveled to Croatia to have sex with her—and then, again with his father's help, brought her to the United States, where he continued to have sex with her. A grand jury indicted Pulido on multiple counts: (1) using the internet to persuade, induce, entice, or coerce a minor to engage in sexual activity; (2) traveling with the intent to engage in illicit sexual conduct; (3) conspiring to transport a minor with the intent that she engage in sexual activity; and (4) transporting a minor with the intent that she engage in sexual activity. The grand jury separately indicted Jimenez for conspiring with Pulido to transport a minor with intent that she engage in sexual activity.

Before trial, Pulido moved to dismiss his indictment on several grounds, to suppress evidence found on various electronic devices, and to exclude testimony about I.G.'s sexual predisposition. The district court denied Pulido's motions, and Pulido and his father went to trial together. Both Pulido and Jimenez filed motions for a judgment of acquittal at the close of the government's case, which the court denied. After a nine-day trial, a jury convicted both Pulido and Jimenez on all counts. Jimenez moved for a new trial and a mistrial, and Pulido joined the new-trial motion. The district court denied the defendants' post-trial motions.

The court thereafter enhanced Jimenez's sentence on the grounds that he had exercised both (1) "undue influence" and (2) "custody, care, or supervisory control" over I.G.

On appeal, Pulido challenges the district court's denials of his pre- and post-trial motions, including his motion for judgment of acquittal. Jimenez challenges the district court's denial of his motion for judgment of acquittal, his post-trial motions, and the court's imposition of two sentencing enhancements. After careful review, and with the benefit of oral argument, we affirm in all respects save one: We vacate Pulido's conviction on the enticement count and remand for resentencing on the ground that the indictment was duplicitous.

**I**

Pulido, then a 23-year-old man, developed an online relationship with I.G., a 14-year-old Croatian girl, that, all told, spanned some 10 months, from the fall of 2017 to the summer of 2018. I.G. initially told Pulido that she was 15 but later admitted to him that she was only 14. Pulido and I.G.'s friendship eventually developed into a romantic relationship, and the two "officially" became boyfriend and girlfriend by the end of March 2018.

Pulido and I.G.'s relationship was intimate. They shared their social-media passwords, for instance, so that they couldn't keep any secrets from one another. The two also discussed marriage and children, and at one point Pulido even told I.G. that he had bought her a ring. Importantly, Pulido told I.G. that the legal age to consent to sex in Croatia was 15. During video chats, Pu-

lido and I.G. would engage in what Pulido referred to as "pillow talk"; Pulido masturbated on camera for I.G. and directed her to do the same for him.

Jimenez played an active role in Pulido's relationship with I.G.  Pulido kept Jimenez apprised of his communications with I.G. and told his father that he had been "trying to convince [I.G.] to have sex with [him]."  Ex. 30(G) part 1 at 82, Doc. 231-67.  Jimenez often advised Pulido on what to say to I.G., and he told Pulido that I.G. was "the one who ha[d] to start something" and to "[k]eep [his] class" "[e]ven with girls that are old eno[u]gh."  *Id.* at 82–83.  Jimenez also communicated directly with I.G. on social media.  He lectured I.G. about her behavior with other boys, told her that she wasn't sufficiently committed to Pulido, and scolded her for making mistakes in the relationship.

In June 2018, with Jimenez's financial assistance, Pulido traveled to Croatia the day before I.G.'s fifteenth birthday.  Before the trip, he had told I.G. over social media that he wanted to have sex with her and perform oral sex on her during his visit.  During their chats, Pulido and I.G. sometimes used a code, with the number "15"—the age of consent in Croatia and I.G.'s impending birthday—signifying sex.

Pulido proposed to I.G. the day she turned fifteen.  The two had sex shortly thereafter and a number of other times during his stay.  They didn't always use protection, and Jimenez, who had stayed behind in Florida, advised them—after falsely holding himself out as a doctor—about how they could avoid pregnancy.

Pulido stayed in Croatia for six weeks. At the end of Pulido's trip, Jimenez invited I.G. and her family to Florida for a visit. Pulido helped them apply for passports and visas, and Jimenez planned the trip and paid for their applications and airline tickets.

In July 2018, Pulido, I.G., and I.G.'s mother, brother, and sister traveled to Florida. Pulido and I.G. continued to have sex in Florida, usually at Pulido's initiation. When, after two weeks, I.G. and her family were set to return to Croatia, Jimenez instructed one of Pulido's brothers to hide I.G.'s passport and ID, and called his travel agent to cancel I.G.'s return ticket.

The night before I.G. and her family were supposed to leave, Pulido's family told I.G.'s brother and sister that I.G. wasn't going with them. Pulido and Jimenez convinced I.G. to tell her mother the same thing. I.G. testified at trial that she didn't want to stay in Florida but felt like she had to. I.G.'s mother told her that she had to return to Croatia with the family.

Early the next morning, Pulido and I.G. went to a restaurant and sat there for hours. I.G.'s mother realized when she woke up that I.G. wasn't in the house and panicked. When I.G.'s mother said she wanted to call the police, Jimenez told her that she shouldn't because Pulido would have I.G. request asylum—meaning that no one could see I.G. for months and he wouldn't be able to help get her home. Jimenez promised I.G.'s mother that he would help return I.G. safely to Croatia. In fact, at the same time, Jimenez was texting Pulido to keep him informed regarding I.G.'s family's departure. When I.G. received a message

6                    Opinion of the Court                    22-10709

from her mother while she and Pulido were in the restaurant parking lot, Pulido told her how to reply. After I.G.'s family left for the airport, she and Pulido returned to his house.

I.G. testified that when she told Pulido and Jimenez the next morning that she wanted to go home, they got angry. Jimenez yelled at I.G. for being irresponsible and not appreciating all the sacrifices that they had made for her. He told I.G. that he would try to get her a ticket back to Croatia as soon as possible, but he also repeatedly told her that he couldn't find one. According to Jimenez's travel agent, after he cancelled I.G.'s initial return flight, he never contacted her to book a new one.

At the same time Jimenez said he was trying to find I.G. a flight back to Croatia, he and Pulido were restricting her ability to communicate with her mother, allowing her to use their phones only briefly, and telling her what to say when she did so. I.G. further testified that, in the meantime, Jimenez completed asylum paperwork for her, had her sign it, and took her to see an immigration lawyer.

Eventually, I.G. was able to tell her mother that she wanted to come home. I.G.'s mother contacted the police, who promptly intervened. Florida Department of Law Enforcement officials were dispatched to Pulido's house for a welfare check, where Jimenez greeted and spoke with them about the situation. Jimenez told the agents that I.G. had indicated that she wanted to stay in Florida and showed them the immigration form that he said I.G. had completed.

During their visit, the agents asked to speak with I.G., so Jimenez went and got her.  The officers spoke with I.G. alone and, after hearing her version of events and assessing the situation, they asked to speak with Pulido but were told that he wasn't there.

The agents contacted the Florida Department of Children and Families, which took I.G. into temporary custody.  I.G. reunited with her mother at the Tampa airport a few days later, and the two flew back to Croatia together.

During interviews with various law-enforcement officers in the United States, I.G. denied having sex with Pulido.  But once she was back in Croatia, I.G. admitted that she and Pulido had indeed had sex.  I.G. said that she changed her mind about telling investigators because she had started to lose feelings for Pulido and that it was more important for them to know the truth than for her to avoid embarrassment.

Meanwhile, Pulido had fled to Mexico the day after Florida officials took temporary custody of I.G.  He remained there until a family member informed him that it was safe to return.  Homeland Security Investigations Special Agent Tavey Garcia, who had been assigned to I.G.'s case, advised Customs and Border Protection ("CBP") officers to be on the lookout for Pulido's return to the United States and to seize all of his electronic devices for a border search.  Notwithstanding her alert, Pulido returned to the United States in September 2018 without detection.

Pulido traveled to Mexico again in May 2019.  When he reentered the United States in early June, CBP agents stopped him, seized his iPhone and MacBook, and sent the devices to Agent Garcia.

Agent Garcia gave the iPhone and MacBook to a computer analyst who performed forensic searches of the devices by copying all of their data and making the devices' files available for review.[1]  The resulting report contained photographs of Pulido and I.G. cuddling and kissing, headshots of I.G. and her family used for their passports and visas, I.G.'s asylum application, screenshots of messages to I.G. on various social media platforms (*e.g.*, Facebook, WhatsApp), and iMessage and Skype chats.  Agent Garcia reviewed the reports for both devices and took notes that she included in a written report.

## II

A grand jury indicted both Pulido and Jimenez on a variety of charges.  In particular, it charged Pulido with four counts: (1) using the internet to knowingly persuade, induce, entice, and coerce someone under the age of 18 to engage in sexual activity

---

[1] A "forensic" search of an electronic device (alternatively called an "advanced" search) is distinct from a "basic" or "manual" search.  *See Alasaad v. Mayorkas*, 988 F.3d 8, 13 (1st Cir. 2021) (noting that CBP policy categorizes an "advanced" search as one "in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents") (quotation marks and citation omitted).

for which a person could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(b); (2) traveling with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); (3) conspiring to transport a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. § 2423(a) and (e); and (4) transporting a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. § 2423(a). The grand jury indicted Jimenez on one count of conspiring to transport a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. §§ 2423(a) and (e).

Pulido moved to dismiss the indictment against him on several grounds. He contended that (1) the enticement count was duplicitous because although it nominally charged him with only one crime, it in fact improperly charged two or more separate and distinct offenses; (2) the traveling-with-intent count was unconstitutional because the statute on which it was predicated exceeded Congress's Foreign Commerce Clause power and impermissibly burdened his rights of "travel and free thought"; and (3) the transportation-of-a-minor counts were legally insufficient because they failed to identify an underlying Florida statute that he intended to violate.

The district court denied Pulido's motion. The court rejected Pulido's duplicitousness contention, reasoning that enticement of a minor is a "continuing offense" and, therefore, that the

count was not duplicitous as charged.[2]  The district court also held that the traveling-with-intent statute was constitutional, and that the transportation-of-a-minor counts were legally sufficient.

Before trial, Pulido moved to suppress evidence recovered from his iPhone and MacBook.  Pulido contended that the agents' review of the messages on his electronic devices violated the Fourth Amendment.  In particular, he argued that under the so-called "border search" exception, officials may make a warrantless search only for contraband and that, in doing so, they may only take a cursory glance.  Relying on *Riley v. California*, 573 U.S. 373 (2014), Pulido asserted that officials needed, but lacked, a warrant to search his devices, or, at the very least, needed probable cause or reasonable suspicion to believe that they contained contraband.  A magistrate judge held an evidentiary hearing and then recommended denying Pulido's motion, concluding that the border-search exception isn't limited to contraband and that the officers' search didn't violate the Fourth Amendment.  Over objection, the

---

[2] "A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse . . . ."  *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166 (1939) (quotation marks and citation omitted).  It "is not complete upon the first act, but instead continues to be perpetrated over time."  *United States v. Rojas*, 718 F.3d 1317, 1320 (11th Cir. 2013) (quotation marks and citation omitted).  Conspiracy and possession of a firearm are illustrative examples.  *See United States v. Gilbert*, 136 F.3d 1451, 1453 n.4 (11th Cir. 1998) (conspiracy); *United States v. Rivera*, 77 F.3d 1348, 1351 (11th Cir. 1996) (possession of a firearm).

district court accepted the magistrate judge's recommendation and denied Pulido's motion to suppress.

Pulido and Jimenez separately moved in limine to exclude two items of evidence. Pulido sought to exclude I.G.'s testimony that she was predisposed to chastity on the ground that it was inadmissible under Federal Rule of Evidence 412(a)(2), which bars the introduction of evidence offered to prove a victim's sexual predisposition. The district court denied the motion without prejudice, preferring to decide the matter at trial.[3] Jimenez moved to exclude evidence about his immigration status on the ground that it was irrelevant and prejudicial, but the government agreed that his legal status was irrelevant to the charged crime and explained that it had no intention of presenting any such evidence.

Several issues arose during trial that have given rise to challenges on appeal. First, there were a few translation issues at the start of I.G.'s mother's testimony. For instance, during the first 27 minutes of her testimony, the government's lawyer initially asked I.G.'s mother questions in English, and she attempted to answer in English with some difficulty, raising a concern that she might not be properly understanding the questions. To ameliorate that risk, the judge asked her to answer in Croatian and allow an interpreter to translate. Even then, though, the judge also ex-

---

[3] At trial, Pulido lodged repeated objections when I.G. testified about her predisposition to chastity, which the district court overruled.

pressed concern that some of the interpreter's translations were summaries rather than word-for-word recitations.

Second, when the government called Agent Garcia to testify, Jimenez requested a sidebar conference because he was concerned that Garcia would testify that he was in the country illegally. The government repeatedly assured the judge that it had no intention of eliciting that information and that it only envisioned Garcia testifying that Jimenez wasn't a medical doctor. Immediately after the conference, though, when the prosecutor asked Garcia if she could determine whether Jimenez was a doctor, she responded that "[b]ased on [her] investigation, [she] determined that Mr. Jimenez entered the United States legally in the '80s, but he remained in the United States—." Trial Tr. Day 7 at 140:18–24, Doc. 218. Jimenez promptly objected, and the judge struck Garcia's response from the record and instructed the jury to disregard it. When Jimenez later moved for a mistrial based on Agent Garcia's testimony about his immigration status, the judge (while acknowledging that the testimony was "really inappropriate") reserved ruling on the issue. *Id.* at 165:5, 7; 168:19.

At the close of the government's case, Pulido moved for a judgment of acquittal on the same duplicitousness ground that he had raised in his motion to dismiss. Jimenez separately moved for a judgment of acquittal, arguing that no reasonable juror could find beyond a reasonable doubt that he was guilty of the conspiracy. Specifically, he contended, there was no evidence that he intended to transport I.G. to Florida for the purpose of her engag-

ing in unlawful sexual acts there.  The district court denied both motions, and the jury convicted Pulido and Jimenez on all counts.

Following the verdict, Jimenez moved for a new trial based on (1) the translation irregularities involving I.G.'s mother's testimony, (2) the admission of evidence regarding I.G.'s virginity and sexual inexperience, and (3) Agent Garcia's testimony regarding his immigration status.  Pulido joined Jimenez's motion, which the district court denied on all counts.  The district court acknowledged that the law generally requires continuous word-for-word translation, but it held that the summaries didn't render the trial fundamentally unfair in the light of all the evidence presented:  I.G.'s mother testified for more than four and a half hours, and only the first 27 minutes were in English; when she testified in English, her responses indicated that she understood the questions.  The court further held that I.G.'s testimony about her sexual inexperience was admissible under Rule 412.  That rule, the court concluded, protects alleged victims from cross-examination about their sexual histories and sexual dispositions; it does not prevent a victim from producing relevant evidence regarding her virginity, chastity, etc.  And finally, the court held that Agent Garcia's testimony necessitated neither a new trial nor a mistrial because (1) her statement was unelicited and unresponsive, (2) it was followed immediately by a curative instruction, and (3) there was substantial evidence of Jimenez's guilt.

At sentencing, the district court enhanced Jimenez's sentence over his objection.  As relevant here, the court applied both

(1) a two-level enhancement under U.S.S.G. § 2G1.3(b)(1)(B) on the ground that Jimenez exercised "custody, care, or supervisory control" over I.G. and (2) a two-level enhancement under § 2G1.3(b)(2)(B) on the ground that he exercised "undue influence" over her.

Pulido and Jimenez both appealed.

### III

We divide our discussion into two parts. We first address Pulido's challenges to the district court's orders denying his motion to dismiss, his motion to suppress, and his motion for a new trial.[4] We then consider Jimenez's motion for acquittal based on sufficiency of the evidence, his motion for a mistrial, and his challenges to the two sentence enhancements.

### A

### 1

Pulido first argues that the district court erred in denying his motion to dismiss. In particular, he contends (1) that the enticement-of-a-minor count is duplicitous, (2) that the traveling-with-intent count violates the Foreign Commerce Clause, and (3) that the traveling-with-intent count impermissibly burdens his

---

[4] For reasons explained below, we find that we needn't reach Pulido's Rule 412 argument that the district court erred in refusing to exclude evidence that I.G. was predisposed to chastity.

22-10709               Opinion of the Court                15

rights of travel and "free thought."[5]  We'll take each challenge in turn.

### a

### i

Pulido contends that the district court should have dismissed his indictment on the ground that the enticement-of-a-minor count was "duplicitous."[6]  Although the issue is not without some complexity, we agree with him.[7]

---

[5] Pulido initially contended that the transportation-of-a-minor count was legally insufficient, but he has since conceded that a decision issued after his indictment forecloses his insufficiency challenge, and he raises that challenge before us solely to preserve it.  *See United States v. Doak*, 47 F.4th 1340, 1352–53 (11th Cir. 2022).

[6] For ease of reference, we will refer to "enticement" as a stand-in for the four distinct means of violating 18 U.S.C. § 2422(b): persuading, inducing, enticing, and coercing a minor to engage in sexual activity.

[7] We normally review a district court's decision to deny a motion to dismiss for abuse of discretion, *United States v. Di Pietro*, 615 F.3d 1369, 1370 n.1 (11th Cir. 2010), but because determining whether an indictment was duplicitous requires a legal inquiry, we review the decision here de novo, *see United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989); *United States v. Hassoun*, 476 F.3d 1181, 1185 (11th Cir. 2007).  But, as with most non-structural errors, we will assess the district court's holding for harmlessness.  *Cf. Hicks v. Head*, 333 F.3d 1280, 1285 (11th Cir. 2003) ("[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [non-structural] errors that may have occurred are subject to harmless-error analysis." (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986))); *cf. United States v. Deason*, 965 F.3d 1252, 1267–68 & n.3 (11th Cir. 2020) (stating that charging duplicitous counts is not a structural error).

"A count in an indictment is duplicitous if it charges two or more separate and distinct offenses." *United States v. Seher*, 562 F.3d 1344, 1360 (11th Cir. 2009) (quotation marks and citation omitted). The risk of a duplicitous count is that "(1) [a] jury may convict a defendant without unanimously agreeing on the same offense; (2) [a] defendant may be prejudiced in a subsequent double jeopardy defense; and (3) [a] court may have difficulty determining the admissibility of evidence." *United States v. Deason*, 965 F.3d 1252, 1267 (11th Cir. 2020) (citation omitted). To determine whether a count is duplicitous, we "look to the text of the underlying statute" and consider "what conduct constitutes a single offense." *Id.* (citations omitted).

The indictment here charged Pulido with violating 18 U.S.C. § 2422(b), in conjunction with Fla. Stat. §§ 800.04(4)(a) and (b). Section 2422(b) reads as follows:

> Whoever, using . . . any . . . facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces an individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years of life.

Here, the criminal "sexual activity" that served as the hook for § 2422(b)'s application was "lewd or lascivious battery" under Fla. Stat. § 800.04(4). At the relevant time, that statute read as follows:

(a) A person commits lewd or lascivious battery by:

1. Engaging in sexual activity with a person 12 years of age or older but less than 16 years of age; or

2. Encouraging, forcing, or enticing any person less than 16 years of age to engage in sadomasochistic abuse, sexual bestiality, prostitution, or any other act involving sexual activity.

Fla. Stat. § 800.04(4)(a) (2014).  The Florida statute defines "sexual activity" as "the oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object."  *Id.* § 800.04(1)(a).  Accordingly, for our purposes, Pulido violated § 2422(b) if he enticed I.G. to have oral, vaginal, or anal intercourse with him.

Importantly here, "[t]he underlying criminal conduct that Congress expressly proscribed in passing § 2422(b) is the persuasion, inducement, enticement, or coercion of the minor rather than the sex act itself." *United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004).[8]  Thus, put simply, a person can be guilty of violating § 2422(b) if he entices a minor to engage in sexual activity, regardless of whether the sexual activity ever occurs. *See id.* at 1287.

---

[8] Although *Murrell* arose under § 2422(b)'s "attempts" clause, *see* 368 F.3d at 1286, its description of what constitutes a violation applies equally to the completed version of the crime.

Pulido contends before us that because § 2242(b) criminalizes the act of enticement itself, the criminal offense is complete the moment the minor is enticed. It's possible, he argues, for a minor to have been enticed on multiple occasions regardless of when—or again, even whether—any sexual activity occurred. In such a case, Pulido contends, an indictment would need to list multiple enticement offenses to cover each criminal act. He faults his indictment for listing only one enticement count to cover a 10-month period during which he and I.G. engaged in numerous conversations about sex and had numerous sexual encounters. This is problematic, he says, because it allows for the possibility that the jurors didn't unanimously agree on the *same* act of enticement. By way of illustration, Pulido posits that some jurors might have concluded that he enticed I.G. in messages that he sent before he traveled to Croatia; others might have concluded that he did so while he was in Croatia; and still others might have found that he did so only when he and I.G. returned to Florida.

The government denies that the indictment was duplicitous. It contends that enticement can be demonstrated through a pattern of activity because, it says, "[w]e know enticing a child to engage in illicit sexual activity is ordinarily a process, not a discrete act; each act in the process need not be charged separately."[9] Br. of Appellee at 49–53.

---

[9] The government argued before the district court that § 2422(b) is a "continuing offense." As already explained, *see supra* at 9–10 n.2, a continuing offense is a crime that "is not complete upon the first act, but instead continues

It seems to us that Pulido and the government are talking past one another. It's true, as the government asserts, that it can point to a pattern of activity to prove the commission of the entice-ment offense. But it's also true that such a pattern culminates in a discrete episode of enticement. In that moment, the instant when the minor has been enticed after days (or weeks, or months) of conduct by the defendant, the § 2422(b) offense has occurred.

So, as applied to this case, it may be that it took Pulido weeks or months to entice I.G. to engage in illicit sexual activity with him. But the moment that Pulido was able to move I.G.'s mental state from one of hesitation to one of agreement *for the first time*, he violated § 2422(b). Subsequent episodes in which he successfully moved her mind would constitute distinct acts of enticement, and thus independent violations of the statute. By failing to charge multiple enticement counts in a case that involved a 10-month re-lationship, numerous online conversations about sex, and multiple sexual encounters in both Croatia and Florida, the government produced an indictment that creates the risk that the jury "may [have] convict[ed Pulido] without unanimously agreeing on the

---

to be perpetrated over time." *Rojas*, 718 F.3d at 1320. Significantly, though, "offenses should not be considered continuing unless the explicit language of the . . . statute compels such a conclusion, or the nature of the crime in-volved is such that Congress must assuredly have intended that it be treated as a continuing offense." *Id*. (quotation marks and citation omitted and al-teration adopted). The government seems to have abandoned its continu-ing-offense theory on appeal.

same offense." *Deason*, 965 F.3d at 1267.  And that makes the § 2422(b) count duplicitous.

**ii**

Before vacating the § 2242(b) count and conviction, we must assess whether allowing the count to go to trial was harmless.  It wasn't.

"The harmless-error test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *United States v. Cannon*, 987 F.3d 924, 947 (11th Cir. 2021) (quotation marks and citation omitted).  The government has the burden to prove that an error was harmless.  *Id.*

Here, the government contends that any duplicitousness was harmless because "[t]here is no risk that the jury found Pulido guilty without unanimously agreeing that Pulido's conduct satisfied the elements of enticement."  Br. of Appellee at 55.  It asserts that the district court's instruction requiring the jury to unanimously agree to the method of the commission (*i.e.*, whether Pulido persuaded, induced, enticed, or coerced) was sufficient to allay any concerns about lack of unanimity.

That is incorrect.  The problem isn't that the jury might not have unanimously agreed to the *method* by which Pulido violated § 2422(b).  Rather, the problem is that it might not have unanimously agreed about the *moment* that I.G. was enticed.  I.G. testified at trial that she and Pulido had sex several times in Croatia, and also frequently in Florida at Pulido's initiation.  The government never demonstrated the moment at which I.G. was enticed,

nor did it seek to prove I.G.'s mental state at any particular point during the 10-month period.  With so many episodes of sexual activity—each of which may (or may not) have been induced by one or more acts of enticement—we cannot say that the government has carried its burden of proving harmlessness beyond a reasonable doubt.

★  ★  ★

Because the enticement-of-a-minor count was duplicitous, and because the error wasn't harmless, we vacate Pulido's conviction on that count and remand with instructions for the district court to dismiss it.

**b**

Pulido next asserts that the district court should have dismissed his traveling-with-intent count on the ground that Congress violated the Foreign Commerce Clause in enacting § 2423(b).[10]

The Constitution authorizes Congress "[t]o regulate Commerce with foreign Nations."  U.S. Const. art. I, § 8, cl. 3. "Neither [we] nor the Supreme Court has thoroughly explored the scope of the Foreign Commerce Clause."  *United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016).  But we have assumed (without deciding) in recent cases that Congress's authority under

---

[10] We review de novo a district court's denial of a motion to dismiss on constitutional grounds.  *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1377 n.3 (11th Cir. 2011).

the Foreign Commerce Clause is at least as broad as its authority under the Interstate Commerce Clause. *Id.* at 668; *United States v. Davila-Mendoza*, 972 F.3d 1264, 1271 (11th Cir. 2020). "In other words," we have said:

> Congress's power under the Foreign Commerce Clause includes at least the power to regulate the "channels" of commerce between the United States and other countries, the "instrumentalities" of commerce between the United States and other countries, and activities that have a "substantial effect" on commerce between the United States and other countries.

*Baston*, 818 F.3d at 668 (citing *Gonzalez v. Raich*, 545 U.S. 1, 16–17 (2005).

Pulido resists that equivalency. He accepts that Congress can regulate "the use of the channels of [foreign] commerce," and "the instrumentalities of [foreign] commerce, or persons or things in [foreign] commerce, even though the threat may only come from [intranational] activities." *See* Br. of Appellant Pulido at 55–56 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). But, he says, the "substantial effects" category recognized in the Interstate Commerce Clause context shouldn't extend to Foreign Commerce Clause cases like this one. *Id.* And, the argument goes, because the conduct for which he has been charged—traveling with an intent to engage in illicit sexual conduct with I.G.—is a non-commercial act, his § 2423(b) count would have to rest on a "substantial effects" rationale.

We disagree. This isn't a "substantial effects" case; it's a "channels of [foreign] commerce" case. The power over channels of commerce under the Interstate Commerce Clause permits Congress to "keep the channels of interstate commerce free from immoral and injurious uses." *Lopez*, 514 U.S. at 558 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964)). Because § 2423(b) criminalizes traveling in foreign commerce with an intent to engage in illicit sexual activity, it's directed at people who, for example, buy plane tickets—as Pulido did here—to commit illicit activity in foreign countries. That is a regulation of a channel of foreign commerce with a purpose of keeping it "free from immoral and injurious uses." *Id.*

Because we conclude that Congress acted within its Foreign Commerce Clause power to regulate the channels of foreign commerce when it enacted § 2423(b), we hold that the travel-with-intent count was constitutional as applied to Pulido.[11] Accordingly, we affirm the district court's judgment on that count.

**c**

Pulido finally contends that the district court should have dismissed his indictment on the ground that § 2423(b) impermis-

---

[11] In concluding that the enactment of § 2423(b) was a valid exercise of Congress's Foreign Commerce Clause power over channels of foreign commerce, we join our sister circuits. *See, e.g.*, *United States v. Han*, 230 F.3d 560, 562–63 (2d Cir. 2000); *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006); *United States v. Bredimus*, 352 F.3d 200, 205–08 (5th Cir. 2003); *United States v. Stokes*, 726 F.3d 880, 894–95 (7th Cir. 2013).

sibly burdens his rights of "travel and free thought" under the First and Fifth Amendments.[12]  We are unpersuaded.

To be clear, contrary to Pulido's framing, § 2423(b) doesn't criminalize "thought" in the abstract.  Nor does it "prohibit traveling with an immoral thought, or even with an amorphous intent to engage in sexual activity with a minor."  *United States v. Tykarsky*, 446 F.3d 458, 471 (3d Cir. 2006).  Rather, it criminalizes a concrete act—namely, the act of traveling in foreign commerce with the purpose of committing an illegal sex act with a minor.  And "no federal court has ever held that an individual has a fundamental right to travel for an illicit purpose."  *Id.* at 472 (quotation marks and citation omitted).

It remains unclear whether Pulido challenges § 2423(b) on its face or as applied.  To the extent that he challenges the statute's constitutionality facially, he hasn't demonstrated that it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep."  *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (quotation marks and citation omitted).  And to the extent that Pulido challenges § 2423(b) as applied to his case, he did far more than think immoral thoughts or travel with amorphous in-

---

[12] As with Pulido's Foreign Commerce Clause argument, we review de novo the district court's denial of his motion to dismiss on First and Fifth Amendment grounds.  *Ibarguen-Mosquera*, 634 F.3d at 1377 n.3.

tentions—he bought a plane ticket, traveled to Croatia, and had sex with a 15-year-old girl.[13]

Because Pulido has not sustained his burden to show that § 2423(b) unconstitutionally burdens his First or Fifth Amendment rights either facially or as applied, we affirm the district court's denial of his motion to dismiss on this count.

**2**

Pulido next challenges the district court's denial of his motion to suppress evidence found on his iPhone and MacBook because, he says, the searches of those devices violated the Fourth Amendment. More specifically, he contends that the district court erred in holding that the Fourth Amendment's "border search" exception covers the warrantless, suspicionless searches of his devices.[14]

We apply a two-step analysis to evaluate the validity of a search at the border. *United States v. Alfaro-Moncada*, 607 F.3d 720, 726 (11th Cir. 2010). Step one focuses on whether there was statutory authority to conduct the search. *Id.* (citing *United States v. Ramsey*, 431 U.S. 606, 611–15 (1977)). Step two asks whether the

---

[13] *See United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998) ("[A]ppellant, at a minimum, engaged in a *series of acts* long past the 'mere thinking' stage. . . . [I]t can hardly be claimed that punishment for 'mere thought' is at issue.").

[14] In reviewing a motion-to-suppress decision, "we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018) (citation omitted).

search was reasonable under the Fourth Amendment. *Id.* (citing *Ramsey*, 431 U.S. at 615–16). Here, no one disputes that there was statutory authority, so we proceed directly to the Fourth Amendment reasonableness inquiry.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, . . . papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Under Supreme Court precedent, police generally need a warrant to conduct a search. *United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018). "[F]rom before the adoption of the Fourth Amendment," however, border searches "have been considered to be 'reasonable' by the single fact that the person or item in question has entered into our country from outside." *Ramsey*, 431 U.S. at 619. This is because border searches implicate the "long-standing right of the sovereign to protect itself," *id.* at 616, a right that is "at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). And because the government has such a strong interest in searching at the border, "the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government." *Alfaro-Moncada*, 607 F.3d at 728.

In that vein, we have held that border searches never require a warrant—or even probable cause—to be reasonable. *Vergara*, 884 F.3d at 1312 (citing *Ramsey*, 431 U.S. at 619). Indeed, we have gone further to say that "we require reasonable suspicion at the border only 'for highly intrusive searches of a person's body

such as a strip search or an x-ray examination.'"  *Id.* (quoting *Alfaro-Moncada*, 607 F.3d at 729).  And even more specifically, and more relevantly here, we have held that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border."  *United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018); *see also id.* at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we.").  Together, *Vergara* and *Touset* make this an easy affirmance.

Not so, Pulido says.  Despite our decisions' categorical language, he asserts that we should treat searches of private messages on cell phones differently for two reasons.  First, relying on *Riley v. California*, 573 U.S. 373 (2014), in which the Supreme Court held that an officer's search of a cell phone didn't fall within the Fourth Amendment's search-incident-to-arrest exception, Pulido insists that searching a cell phone is so intrusive of a person's privacy that it (in effect) warrants an exception to the border-search exception.  Second, he contends that searching private text messages on a person's devices exceeds the historical justification for the border-search exception—namely, detecting contraband—and, therefore, that the exception's indulgent reasonableness rule shouldn't apply.

We rejected similar *Riley*-based arguments in *Vergara* and *Touset*.  In *Vergara*, we stated expressly that "[b]order searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule."  884

F.3d at 1312–13. And in *Touset*, we reiterated that "[a]lthough the Supreme Court stressed in *Riley* that the search of a cell phone risks a significant intrusion on privacy, our decision in *Vergara* made clear that *Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border." 890 F.3d at 1234. In particular, we explained in *Touset* that in those instances when we have required reasonable suspicion for a border search, we have defined "intrusiveness" by reference to bodily integrity— "the indignity that will be suffered by the person being searched." *Id.* (citation omitted). Intrusiveness, therefore, is a function of the "personal indignity" that a search causes, not of its scope or extent. *Id.* And in *Touset*, "we fail[ed] to see how the personal nature of data stored on electronic devices could trigger this kind of [personal] indignity" when existing precedent recognized no such afront to one's personal dignity even in the search of his home. *Id.* (citing *Alfaro-Moncada*, 607 F.3d at 729, 732). Simply put, we said that "[p]roperty and persons are different." *Id.* (citing *Flores-Montano*, 541 U.S. at 152).

Vergara and *Touset* likewise foreclose Pulido's argument that government officials exceeded the scope of the border-search exception, which, he says, is limited by the government's sovereign interest in excluding contraband from the country. Forensically extracting and then reading all his private messages, Pulido contends, transgresses the scope of a permissible border search. But again, *Vergara* and *Touset* are not so easily cabined. Neither opinion purports to restrict the operation of the border-search exception to searches for contraband. To the contrary, both opinions

use categorical language. *See, e.g.*, *Vergara*, 884 F.3d at 1312 ("[W]e require reasonable suspicion at the border *only* for highly intrusive searches of a person's body . . . ." (emphasis added) (quotation marks and citation omitted)); *Touset*, 890 F.3d at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."); *id.* at 1234 ("Property and persons are different."); *id.* at 1231 ("[T]he Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.").

Because our precedents in the border-search context state both (1) that we require reasonable suspicion only for highly intrusive searches of a person's body and (2) that forensic searches of electronic devices don't require any level of suspicion, we affirm the district court's holding that the government's search of Pulido's iPhone and MacBook didn't violate the Fourth Amendment.

### 3

Pulido finally challenges the district court's denial of his new-trial motion based on translation irregularities during I.G.'s mother's testimony, which he contends violated his due-process rights.[15]

---

[15] "We review the district court's denial of a motion for new trial for abuse of discretion." *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009). We review de novo questions of law, including whether a defendant's due-

For constitutional purposes, we must determine whether any of the irregularities rendered Pulido's trial "fundamentally unfair." *United States v. Gomez*, 908 F.2d 809, 811 (11th Cir. 1990) (quotation marks and citation omitted). The "general standard" requires continuous word-for-word translation of everything relating to the trial. *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990). "'[O]ccasional lapses,'" however, "will not render [a] trial 'fundamentally unfair'" because "defendants have no constitutional 'right' to flawless, word for word [interpretations]." *Gomez*, 908 F.2d at 811 (citation omitted). "[I]nterpreters should nevertheless strive to translate exactly what is said," and "courts should discourage interpreters from 'embellishing' or 'summarizing' live testimony." *Id.*

Pulido asserts that the interpretation irregularities during I.G.'s mother's testimony rendered his trial fundamentally unfair. In particular, he says (1) that I.G.'s mother struggled to understand the interpreter's accent and got confused listening to both English and Croatian, and (2) that some interpretations were notably shorter than I.G.'s mother's responses, indicating that they weren't accurate translations. The district court disagreed, and so do we.

---

process rights have been violated. *See United States v. Underwood*, 446 F.3d 1340, 1345 (11th Cir. 2006); *United States v. Savage*, 701 F.2d 867, 868 n.1 (11th Cir. 1983).

The district court reasonably allowed I.G.'s mother to answer questions in English but encouraged her to use the interpreter if she was unsure. While the court noted some irregularities in I.G.'s mother's testimony, it exercised due care to ensure that any errors were remedied. Once the court observed that I.G.'s mother was having difficulty responding in English, it directed her to answer in Croatian and allow the interpreter to translate her answers into English. It also sustained Jimenez's objection to ensure that all remaining questions asked to I.G.'s mother would be translated to her in Croatian. It then reminded the interpreter that the translations of her testimony needed to be word-for-word. The interpreter had assured the court moments before that he was translating everything and not summarizing. And in its order denying the motion for a new trial, the court emphasized that the portion of I.G.'s mother's testimony that was in English occupied only 27 minutes out of four and a half hours she spent on the stand. The court further confirmed that for these 27 minutes, I.G.'s mother understood what she was being asked.[16]

Accordingly, we hold that any interpretation errors didn't render the trial fundamentally unfair. The district court didn't

---

[16] Additionally, we conclude that there was no "cumulative error." *See* Br. of Appellant Pulido at 67. There was, at most, only one error—the district court's refusal to exclude evidence of I.G.'s predisposition for chastity. And because we have vacated the enticement count of Pulido's indictment, we needn't reach Pulido's Rule 412 challenge to that ruling.

abuse its discretion in denying the new trial motion, and we affirm its decision in that respect.

★  ★  ★

To summarize, with respect to Pulido's challenges, we hold as follows:  First, we affirm the district court's rejection of Pulido's challenges to his indictment except for his contention that the enticement count was duplicitous; on that count, we vacate his conviction and remand for resentencing with instructions that the enticement count be dismissed.  Second, we affirm the district court's decision declining to suppress the evidence found on Pulido's electronic devices.  Third, we hold that the district court did not abuse its discretion in denying Pulido a new trial based on the translation irregularities that attended I.G.'s mother's testimony.

**B**

We turn, then, to Jimenez.  We start with the district court's rejection of his motion for judgment of acquittal, followed by the court's denial of his motion for a mistrial, and conclude with the court's imposition of two sentencing enhancements.

**1**

Jimenez first challenges the district court's denial of his motion for judgment of acquittal, in which he asserted that there was insufficient evidence to convict him of conspiring to

transport I.G. in violation of 18 U.S.C. §§ 2423(a) and (e).[17]  In particular, Jimenez argues that the record was devoid of evidence that he intended for I.G. to engage in sexual activity in the United States.  We disagree.

"To support a conspiracy conviction, the government must prove 1) an agreement to commit an unlawful act and 2) an overt act by one of the conspirators in furtherance of the conspiracy." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1998).  "A conspiracy may, indeed usually must, be proven through circumstantial evidence."  *Ibarguen-Mosquera*, 634 F.3d at 1385.  The substantive offense underlying Jimenez's conspiracy conviction prohibits "knowingly transport[ing] an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense."  18 U.S.C. § 2423(a).  When charging a person with conspiracy to commit a substantive offense, the conspiracy "cannot

---

[17] "We review *de novo* a district court's denial of judgment of acquittal on sufficiency of evidence grounds."  *United States v. Fleury*, 20 F.4th 1353, 1367 (11th Cir. 2021) (citation omitted).  "[W]e view the evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in its favor."  *Id.* (quotation marks and citation omitted).  "[W]e will uphold the denial of judgment of acquittal—and affirm the guilty verdict—if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *United States v. Ross*, 131 F.3d 970, 980–81 (11th Cir. 1997) (quoting *Ingram v. United States*, 360 U.S. 672, 678 (1959)).  So the government had to prove that Jimenez had, as at least one of his purposes in transporting I.G. to the United States, an intent that she have sex with Pulido.  *See United States v. Doak*, 47 F.4th 1340, 1354 (11th Cir. 2022).  "[A]n alternative plausible innocent explanation is not enough to prove that the conduct was not motivated by illicit sexual activity."  *Id.* at 1355 (quotation marks and citation omitted).

Jimenez focuses on the intent element.  He explains that while he had conversations with Pulido and I.G. about sex, the government failed to provide evidence that he had the requisite knowledge or intent that the two would have sex in the United States.  He asserts (1) that any conversations about sex were conducted while Pulido was in Croatia where sex with I.G. was legal and (2) that those conversations don't demonstrate that he intended for Pulido and I.G. to continue having sex in the United States.

The government responds that the circumstantial evidence introduced at trial supports the jury's verdict that at least one reason for I.G. coming to the United States was for her and Pulido to have sex.  With respect to Jimenez's intent, in particular, the government emphasized that he (1) coached Pulido how to convince I.G. to have sex with him; (2) knew about the sexual activity between Pulido and I.G.; (3) spoke with I.G. regarding her sexual

experiences; (4) pretended to be a doctor and instructed I.G. how she could avoid pregnancy; (5) hid Pulido's relationship with I.G. from her family; (6) paid for I.G.'s plane ticket to the United States; (7) helped ensure that I.G. didn't return to Croatia with her family; (8) filled out asylum paperwork for I.G.; (9) limited I.G.'s ability to communicate with her mother; and (10) obstructed I.G.'s efforts to return to Croatia.

We agree with the government that a reasonable jury could conclude that Jimenez conspired to transport I.G. to the United States with an intent that she engage in sex with Pulido while she was here. Jimenez knew about the sexual nature of the relationship between Pulido and I.G. He actively coached Pulido how to convince I.G. to have sex with him. He communicated with I.G. directly through social media about her sexual activity, even going so far as pretending to be a doctor to advise her how to avoid pregnancy. And, with full awareness of the nature of I.G.'s relationship with Pulido, Jimenez paid for her plane ticket to the United States. When I.G. arrived in Florida, Jimenez tried to hide her relationship with Pulido from her family. And when I.G. was scheduled to return to Croatia with her family, Jimenez helped ensure that she stayed behind, and when that was successful, he filled out asylum paperwork for her and limited her ability to communicate with her mother. That is more than enough. Accordingly, we affirm the district court's denial of Jimenez's motion for judgment of acquittal.

**2**

Jimenez next challenges the district court's denial of his motion for a mistrial or a new trial, which focused on Agent Garcia's testimony about his immigration status.[18]

A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to grant a new trial is within "the sound discretion of the trial court." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). This determination rests with the district court because it "is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Blakey*, 960 F.2d 996, 1000 (11th Cir. 1992).

We have held that to obtain a new trial a defendant must show that his "substantial rights [were] prejudicially affected" and, further, that such prejudice occurs "when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." *United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009) (quotation marks and citation omitted). "Prejudicial testimony will not mandate a mistrial where there is significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact on the jury." *United States v. Anderson*, 782 F.2d 908, 916 (11th Cir.

---

[18] We review the denial of both types of motions for abuse of discretion. *United States v. Valois*, 915 F.3d 717, 723 n.2 (11th Cir. 2019) (mistrial); *Sweat*, 555 F.3d at 1367 (new trial).

1986) (citation omitted).  Additionally, "[w]hen a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Harriston*, 329 F.3d 779, 787 n.4 (11th Cir. 2003) (quotation marks and citation omitted).

The district court refused to grant a mistrial or new trial because, it found, Jimenez hadn't demonstrated that Agent Garcia's testimony caused a miscarriage of justice.  We agree and, in doing so, decline Jimenez's invitation to adopt a per se rule that every mention of a defendant's illegal immigration status is incurably prejudicial.

Like the district court, we are troubled by Agent Garcia's testimony, which wasn't responsive to the question she was asked and which she offered sua sponte.  Her testimony is doubly troubling given (1) that Jimenez had successfully moved in limine before trial to exclude any reference to his immigration status and (2) that the testimony was offered almost immediately after counsel had a sidebar with the district judge about the risks of such evidence.

Even so, as the district court explained in denying Jimenez's motion, Garcia's testimony was "stray, . . . unelicited, and unresponsive."  *United States v. Pulido*, No. 8:20-CR-292-VMC-CPT, 2022 WL 562351, at \*7 (M.D. Fla. Feb. 23, 2022).  Moreover, the district court acted quickly to sustain Jimenez's objection, struck the testimony from the record, and gave a curative instruction

that the jury should disregard it. *Cf. United States v. Valois*, 915 F.3d 717, 726 (11th Cir. 2019) ("We presume that the jury followed the district court's curative instructions." (citation omitted)).  Finally, the other evidence of Jimenez's guilt was substantial, further reducing the likelihood that Garcia's testimony had a meaningful impact on the jury. *See supra* at 34–35.[19]

Accordingly, we affirm the district court's denial of Jimenez's motion for a mistrial or a new trial.

---

[19] *Sanchez v. Davis*, 888 F.3d 746 (5th Cir. 2018) (Costa, J., single-judge order), on which Jimenez relies, is distinguishable.  First, and most obviously, the single-judge order there resolved only a threshold procedural issue, not the merits of any claim.  A federal habeas corpus petitioner had sought a certificate of appealability requesting permission to challenge a district court's rejection of his contention that his state-court trial counsel had rendered ineffective assistance when he failed to object to a question about his immigration status.  In *Sanchez*, the judge concluded only that the petitioner had met the baseline showing necessary to the issuance of a COA—namely, that "jurists of reason" could disagree with the district court's resolution of the claim.  *Id*. at 749, 751–52; *see also* 28 U.S.C. § 2253(c)(2).  Second, and in any event, there are conspicuous factual distinctions.  To be sure, Judge Costa stated that "a defendant's illegal status is considered so inflammatory that it is often the subject of motions in limine, the point of which is to ensure that testimony is not revealed to the jury that is so prejudicial that even a subsequent instruction to disregard cannot undo the damage." *Davis*, 888 F.3d at 751.  He also noted that "the introduction of even a single impermissible mention of a defendant's immigration status is often a highly prejudicial bell that cannot be unrung." *Id*. at 752.  Notably, though, in granting the COA, Judge Costa emphasized "a jury note showing that [the petitioner's] unlawful status was a topic during deliberations." *Id*.  Here, there is no such smoking gun.

### 3

Jimenez lastly challenges two sentencing enhancements. In particular, he contends that the district court erred in applying a two-level "undue influence" enhancement under U.S.S.G. § 2G1.3(b)(2)(B) and a two-level "custody, care, or supervisory control" enhancement under U.S.S.G. § 2G1.3(b)(1)(B).[20] We'll take each in turn.

### a

Section 2G1.3(b)(2)(B) directs a district court to increase a defendant's offense level by two if he "unduly influenced a minor to engage in prohibited sexual conduct." We have explained that "[b]ecause undue influence is a factual finding, we review for clear error." *United States v. Whyte*, 928 F.3d 1317, 1336 (11th Cir. 2019).

Comment 3(B), which we followed in *Whyte*, states that a reviewing court should "closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." *Id.* (quoting U.S.S.G. § 2G1.3(b)(2)(B), cmt. 3(B)). The same comment provides that there is a rebuttable presumption of undue influence if the defendant is at least 10 years older than his minor victim. *Id.* In determining whether a defendant has rebutted the presumption, the court should consider whether the defendant's conduct

---

[20] We review a sentencing court's application of the Guidelines de novo and its factual determinations for clear error. *United States v. Demarest*, 570 F.3d 1232, 1239 (11th Cir. 2009).

"displayed an abuse of superior knowledge, influence and re-sources." *Id.* (citation omitted).[21]

Jimenez claims that even though he was more than 10 years older than I.G. and helped to pay for I.G. and her family to come to the United States, he didn't abuse any superior knowledge, influence, or resources. The government responds by emphasizing that Jimenez (1) purchased I.G.'s plane ticket to the United States; (2) refused to rebook I.G.'s flight home; (3) controlled I.G.'s access to her mother after she returned to Croatia; (4) prepared I.G.'s asylum paperwork; (5) told a law enforcement officer that he shouldn't have spoken to I.G. without Jimenez's permission; (6) misleadingly told I.G. that he was a doctor so that she would talk to him about sex; and (7) instructed I.G. to tell her mother that she wouldn't be returning to Croatia.

For purposes of assessing whether the undue-influence enhancement applies, we consider a broad range of "[r]elevant conduct." U.S.S.G. § 1B1.3; *see also United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017). In particular, we may consider not only Jimenez's conduct "during" and "in preparation for" the offense of conspiring to transport I.G. to the United States but al-

---

[21] We have since clarified that the commentary can't alter the scope of an unambiguous provision of the Sentencing Guidelines. *See United States v. Dupree*, 57 F.4th 1269, 1273–77 (11th Cir. 2023) (en banc). We don't read Comment 3(B) as expanding § 2G1.3(b)(2)(B). Moreover, Jimenez hasn't argued that *Dupree* abrogated or otherwise undermined our decision in *Whyte* in this respect; rather, he contends that he has rebutted the presumption of undue influence articulated in the commentary.

so any post-offense conduct aimed at "attempting to avoid detection or responsibility." U.S.S.G. § 1B1.3(a)(1)(B). "Relevant conduct" further includes all harm that "resulted from" or "that was the object of" the acts and omissions by Jimenez, *id.* § 1B1.3(a)(3), and "any other information specified in the applicable guideline," *id.* § 1B1.3(a)(4).

We hold that the district court did not clearly err in finding that Jimenez exercised undue influence over I.G. By spending his own money to pay for I.G.'s visa application and fly her to the United States, Jimenez used his "resources" to "influence" I.G.'s decision to travel. By posing as a doctor and then discussing I.G.'s fertility with her, he used his superior "knowledge" to "influence" her decisions regarding when and how to engage in sexual activity with Pulido. And by instructing I.G. to tell her mother that she wouldn't be returning to Croatia, promising—but then refusing—to book her flight home, and controlling I.G.'s communications with her mother after she returned to Croatia, he used his "influence" to compromise the voluntariness of her decision to stay in the United States. Given this evidence, we hold that the district court correctly applied the undue-influence enhancement, and we affirm its decision in that respect.

**b**

Last up: Jimenez's challenge to the district court's imposition of the "custody, care, or supervisory control" enhancement. Section 2G1.3(b)(1)(B) instructs a sentencing court to enhance the offense level by two if a minor involved in a sex-related crime

"was otherwise in the custody, care, or supervisory control of the defendant." U.S.S.G. § 2G1.3(b)(1)(B). Jimenez contends that the district court erroneously imposed this enhancement because, among other reasons, he didn't have custody of I.G. until after he had completed his offense conduct.

The district court applied the enhancement because, in its view, Jimenez was responsible for all conduct in furtherance of the conspiracy, which it described as "getting I.G. to have sex with Pulido." Sentencing Tr. at 17:4–6, Doc. 285. We agree.

To begin, the commentary to § 2G1.3 makes clear that the enhancement is "intended to have broad application"—such that, for instance, it may be imposed even where a minor is only "temporarily" entrusted to the defendant. U.S.S.G. § 2G1.3 cmt. n.2(A). Moreover, for reasons already explained, in assessing the appropriateness of Jimenez's sentence, we may consider all "[r]elevant conduct"—*i.e.*, not only his actions undertaken in preparation for and during the conspiracy, but also his actions thereafter that were aimed at "attempting to avoid detection or responsibility," as well as any harm that "resulted from" or "that was the object of" his acts and omissions. U.S.S.G. §§ 1B1.3 (a)(1)(B), (a)(3).

Here, the case that I.G. was entrusted to Jimenez's care is straightforward. At the very least, Jimenez unquestionably exercised supervisory control over I.G. when she stayed at his home in Florida after her family returned to Croatia. The district court found that I.G.'s mother entrusted her daughter to Jimenez, and

I.G. physically lived in his house for the week following her family's departure. Jimenez hasn't demonstrated that this factual determination was clearly erroneous. *See Demarest*, 570 F.3d at 1239. Accordingly, we agree that when I.G. lived under Jimenez's roof for a full week—without her family there with her—he assumed a caretaker-like status over her, *see United States v. Isaac*, 987 F.3d 980, 992 (11th Cir. 2021) (applying the enhancement where the defendant acted as a temporary caretaker charged with looking after the victim's wellbeing), and we therefore affirm the district court's application of the "custody, care, or supervisory control" enhancement.

## IV

For the foregoing reasons, we **AFFIRM** the district court's judgment on all matters related to Pulido except his enticement count. On that issue, we **VACATE** his conviction and **REMAND** for resentencing in accordance with this opinion and with instructions that the enticement count be dismissed. We **AFFIRM** the district court's judgment on all matters related to Jimenez.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED** in part.

22-10709                 Rosenbaum, J., Concurring                 1

ROSENBAUM, Circuit Judge, Concurring:

I join the Majority Opinion in full but write separately to highlight two points about our decision to vacate Pulido's 18 U.S.C. § 2422(b) conviction. First, our Circuit's strict approach to duplicitous indictments requires us to vacate Pulido's conviction, even though our sister circuits may have upheld it. Second, our decision will require the government to charge § 2422(b) violations by the enticement, not by the victim. And that defies the reality of the crime Congress intended to prevent.

As the Majority Opinion points out, a defendant violates § 2422(b) when the defendant *entices* the minor to engage in illegal sexual activity, Maj. Op. at 17—that is, when the minor, in part because of the defendants' actions, *decides* to engage in illegal sexual activity with the defendant. Throughout an entire relationship, a defendant may engage many times in illegal sexual activity with a minor.

So it's no stretch to say that a count alleging a single violation of § 2422(b) based on a victim's entire relationship with a defendant may include multiple enticements (and thus multiple § 2422(b) violations under our precedent).

But it does not necessarily follow under the statutory text that an indictment is improper just because it alleges § 2422(b) violations by victim, rather than by enticement. After all, outside our Circuit, the government routinely charges § 2422(b) violations by the victim, not the enticement—and courts routinely uphold those conviction without discussion of potential duplicity issues.

*See, e.g., United States v. Greaux-Gomez*, 52 F.4th 426, 440 (1st Cir. 2022); *United States v. Harris*, 991 F.3d 552, 554 (4th Cir. 2021).

But our duplicity precedent differs from that of other circuits. We have made clear that "two distinct offenses" must be "alleged in a separate and distinct count of the indictment." *United States v. Schlei*, 122 F.3d 944, 979 (11th Cir. 1997) (quoting *Bins v. United States*, 331 F.2d 390, 393 (5th Cir.), *cert. denied*, 379 U.S. 880 (1964)).[1] And under our prior-precedent rule, that precedent binds us. *See United States v. Davis*, 730 F.2d 669, 672 (11th Cir. 1984). So we must enforce our rule and require the government to charge individually the distinct enticements that occur throughout a victim's entire relationship with a defendant.

Other circuits, by contrast, have not taken such a strict approach to duplicitous indictments. Some have adopted a "general rule that criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all of the actions are part of 'a single scheme.'" *United States v. Moloney*, 287 F.3d 236, 240 (2d Cir. 2002) (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)); *see also United States v. Canas,* 595 F.2d 73, 78–79 (1st Cir. 1979). In other words, just because the government *can* charge multiple violations separately does not mean that it *must* do so. And that makes some sense. When the "essence" of the alleged crime is a "single scheme," the

---

[1] All Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

22-10709              Rosenbaum, J., Concurring                3

risk of unfairness to the defendant is "slight," *Margiotta*, 646 F.2d at 733, because a jury must unanimously agree that the totality of the defendant's conduct violates the pertinent statute.

That is especially true for how the government prosecutes § 2422(b) offenses. The essence of the offense is often a "single scheme": a prolonged, impermissible sexual relationship with a minor. So when a jury convicts a defendant of perpetrating such a relationship in violation § 2422(b), it necessarily unanimously concludes that the defendant caused the minor's mental state to change from not agreeing to engage in a sexual relationship with the defendant to agreeing to do so. To be sure, without a proper instruction,[2] there is the chance that jurors do not debate and agree on the exact *instance* when the victim's mental state changed. But even in that case, there is no dispute that the jurors unanimously agreed that the defendant violated the statute.

---

[2] Because a duplicitous indictment is not a structural error, we assess in each case whether the duplicitous count was harmless. *See United States v. Deason*, 965 F.3d 1252, 1267 (11th Cir. 2020). And an instruction to the jury may render a duplicitous indictment harmless. *See United States v. Damrah*, 412 F.3d 618, 623 (6th Cir. 2005) (concluding a unanimity instruction rendered any duplicity harmless); *Cf. Schlei*, 122 F.3d at 980 (concluding duplicity doomed the indictment and noting the "absence of a unanimity instruction"). For instance, if the district court had instructed the jurors that they must unanimously agree as to at least one instance where Pulido persuaded, induced, enticed, or coerced I.G. to engage in illegal sexual activity during the course of their relationship, then we could have been sure that the jury unanimously agreed as to at least one completed § 2422(b) offense. Any duplicity would have been harmless, and we would have upheld the conviction.

Still, our precedent forecloses us from entertaining such contentions. And that leads me to my second point: our precedent will force the government to charge § 2422(b) violations by the enticement, rather than the victim, which defies the reality of the crime Congress enacted § 2422(b) to prevent.

Congress amended § 2422(b) to its modern form in 1996 to combat the growing trend of "cyberpredators interacting with minors online." Andriy Pazuniak, *A Better Way to Stop Online Predators: Encouraging A More Appealing Approach to § 2422(b)*, 40 SETON HALL L. REV. 691, 696 (2010). Congress was concerned that "[t]he anonymous nature of the on-line relationship allows users to misrepresent their age, gender, or interests. [So] [p]erfect strangers can reach into the home and befriend a child." H.R. REP. NO. 105-557, at 12 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 680. In other words, Congress sought to prevent the harm and trauma of an inappropriate and illegal sexual relationship that a cyberpredator's single but ongoing enticement caused.

And that makes sense because, as a matter of reality, a victim's second and later sexual acts with the same predator are often further consequences of the initial (and continuing) enticement. After all, once a predator has, over days, weeks, months, or even years, changed a victim's mind so that the victim acquiesces in the first sexual act, the victim's reluctance to engage in sexual acts with the predator has been breached. So the victim may be more likely to acquiesce in additional sexual acts without further enticement. And in any case, even if further enticement occurs,

22-10709                Rosenbaum, J., Concurring                5

it's often fair to say that the initial enticement was vital to convincing the victim's later sexual acts. So charging § 2422(b) violations by each sexual act enticed throughout that relationship ignores both reality and the core ill Congress sought to combat.

That, in turn, leads to some odd, and even harmful, results. For starters, it may be impossible to ascertain whether a victim's state of mind changed multiple times throughout their relationship with the defendant or whether the victim's entire relationship with the defendant derived from the initial enticement. But because the government must charge individual enticements separately, it will likely have to parse the victim's sexual activities by the event to effectively capture each time the victim's state of mind changed (or if it never did). And beyond the practical issues that may pose for a witness who may struggle to remember their thoughts and feelings at such a granular level, it will force the victim to relive before a grand jury and in open court harsher versions of the trauma they already endured.

Plus, the government will charge multiple times a crime that already carries a ten-year mandatory-minimum sentence with the possibility of up to life in prison. 28 U.S.C. § 2422(b). Congress vested judges with the discretion to determine the proper sentence within that range based on the totality of the facts before them. But forcing the government to charge by the enticement, rather than the victim, multiplies the statutory minimum; it eliminates the application of our usual sentencing practices that secure uniform and proportionate punishments; and, in

6                    Rosenbaum, J., Concurring                    22-10709

some cases, it may even impose an effectively automatic life sentence.

This is all to say the Majority Opinion arrives at the correct disposition under our precedent, but I have deep concerns about the correctness of our precedent. Congress enacted § 2422(b) to prevent the instigation of illegal sexual relationships with minors online. It understood that a single enticement, inducement, persuasion, or coercion could instigate a prolonged sexual relationship that inflicts immense and lasting trauma on minor victims. And the government has routinely charged § 2422(b) violations on that understanding. But our duplicity jurisprudence—an anomaly compared to that of other circuits—will now force the United States to charge and try cases by the enticement, rather than the victim. And that departs from the reality of the crime the defendant perpetrated, all while harming the victim in the process.